Jonathan O. Hafen
Chad S. Pehrson
Stephen Mouritsen
PARR BROWN GEE & LOVELESS
101 South 200 East, Ste 700
Salt Lake City, UT 84111
Telephone: (801) 532-7915
Facsimile: (801) 532-7550

*Attorneys for Defendant*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ALLEGIS INVESTMENT SERVICES, LLC; ALLEGIS INVESTMENT ADVISORS, LLC; and BRANDON C. STIMPSON, <br><br> Plaintiffs, <br><br> v. <br><br> MARK WATSON, <br><br> Defendant. | **RESPONSE IN OPPOSITION TO MOTION TO VACATE OR MODIFY ARBITRATION AWARD** <br><br> Civil Case No.: 2:18-cv-00283-JNP <br><br> Judge Jill N. Parrish |

Defendant, Mark Watson (the "Defendant"), by and through his counsel, respectfully submits the Opposition to the Motion to Vacate or Modify the Arbitration Award entered in the Financial Industry Regulatory Authority ("FINRA"), Case No. 16-03643, filed by Plaintiffs Brandon C. Stimpson, Allegis Investment Services, LLC ("AIS"), Allegis Investment Advisors, LLC ("AIA") (collectively, the "Plaintiffs").

## INTRODUCTION

This is a case about whether a FINRA arbitration panel (the "FINRA Panel") has the authority to adjudicate a dispute between a FINRA member firm, an associated person of the

FINRA member firm, and their customer, where the customer alleges that the FINRA member and associated person violated FINRA rules, including FINRA Rule 2111 (suitability), FINRA Rule 2010 (unauthorized trading), and FINRA Rule 3110 (failure to supervise).

There is no dispute that on January 26, 2015, Defendant, Mark Watson, met with Plaintiff, Brandon Stimpson, and that in that meeting, Mr. Stimpson recommended that Mr. Watson invest in an investment strategy (the "RUT Strategy").[1] There is no dispute that as a result of this investment, Mr. Watson lost nearly $300,000 in a single day's trading. There is no dispute that at the time of this meeting, Mr. Stimpson was a registered representative and associated person with Allegis Investment Services, LLC—a FINRA member. As such, Mr. Stimpson was subject to FINRA rules and subject to FINRA jurisdiction for violations of those rules. Similarly, as a FINRA member, Allegis Investment Services, LLC, was also subject to FINRA rules (including rules requiring the firm to supervise Mr. Stimpson) and subject to FINRA jurisdiction.

Plaintiffs insist that even though Mr. Stimpson was a registered representative and associated person with a FINRA member when he met with Mr. Watson, the FINRA Panel lacked jurisdiction because upon meeting Mr. Watson, Mr. Stimpson—who is also an investment adviser representative—took off his registered representative hat and put on his investment adviser hat. Plaintiffs have cited no FINRA rule, no FINRA guidance, no SEC rule, no SEC guidance, and no case law that says that a registered representative and associated person of a FINRA member can escape FINRA jurisdiction simply by claiming that while engaged in conduct expressly proscribed by FINRA rules he was wearing a different hat. Indeed, Plaintiffs' own expert, Phillip Feigin, a former head of the Colorado Division of Securities, admitted that FIRNA registration is not "hat," it's a "tattoo"[2]—it cannot be taken off at the representative's convenience.

---

[1] *See* Hearing Transcript, Vol II, at 240:23-241:7, **Ex. 2**; Hearing Transcript, Vol IV at 663:23-664:12, **Ex. 4**.
[2] *See* Hearing Transcript, Vol. IV at 798:8-799:18, **Ex. 4**.

Plaintiffs have raised this "hat switching" argument repeatedly over the course of this matter and each time the panel appropriately has rejected it.[3] At bottom, Mr. Stimpson had a duty as a registered representative and associated person of a FINRA member to make suitable investment recommendations and to prevent unauthorized trading in Mr. Watson's account, pursuant to FINRA rules. Similarly, Allegis Investment Services, LLC, a FINRA member, had a duty to supervise Mr. Stimpson in the exercise of his duties under FINRA rules. The failure of both parties to fulfill their duties under FINRA rules was properly brought before the FINRA Panel for adjudication. The FINRA Panel did not exceed its authority in any respect.

Finally, this dispute is also about whether a FINRA member, AIS, and a registered investment advisor firm, AIA, are judicially estopped from claiming treatment as separate entities when seeking to avoid jurisdiction and liability for their conduct in the FINRA arbitration below (*i.e.,* by claiming erroneously that only AIA, and not AIS, offered the RUT Strategy), while at the same time they are representing in their insurance coverage action that *both* parties offered the RUT Strategy and are entitled to recover under their liability policies. This issue is the predominant focus of Plaintiffs' Motion, even though it has nothing to do with the propriety of the FINRA Panel exercising jurisdiction over, or entering an award against, Mr. Stimpson and AIS. Each of these issues are addressed below.

---

[3] *See e.g.*, Hearing Transcript, Vol. III at 537:22-538:7, **Ex. 3**. Plaintiffs continue to make much of the fact that in one prior case they were able to persuade a FINRA panel to dismiss a statement of claims related to the RUT Strategy. Mot. at 4. But Plaintiffs have conveniently omitted the fact that they have previously attempted to dismiss *five* FINRA arbitrations related to the RUT Strategy (including this case), and that their motions to dismiss were denied in four of the five cases. *See* Respondents' Motion to Dismiss, at 4 n.3, see Dkt. No. 9-13, **Pl. Ex. M** ("Allegis Services made motions to dismiss in four other FINRA cases. In three cases, the FINRA panels denied the motions . . . .") This does not include the fact that their motion in this case was denied not once, but twice. FINRA rulings have no precedential value from one panel to another, but it is nevertheless telling that Plaintiffs have brought and lost motions to dismiss on multiple occasions.

## BACKGROUND

Mark Watson is a general contractor.[4] After approximately 25 years as a senior superintendent for a prominent Utah construction firm, Mr. Watson set out on his own to establish North Face Construction, a general contracting firm based in Kamas, Utah and made up of Mr. Watson and two associates.[5] After nearly forty years in the construction business, Mr. Watson had put together a modest retirement savings, intended to provide for Mr. Watson, his wife Trudi Watson, and for the long-term care of their special-needs child.[6]

On January 26, 2015, Mr. Watson met with Brandon Stimpson. At the time of their meeting, there is no dispute that Mr. Stimpson was both a registered representative and associated person of AIS, a FINRA member, and an investment adviser representative with AIA. Similarly, there is no dispute that at that time, Mr. Stimpson, as a registered representative and associated person of AIS, is subject to AIS's supervisory authority. Mr. Stimpson became a registered representative in late 2000, by passing the Series 6 and 63 examinations.[7] He continued in that capacity until he was discharged by Allegis on December 13, 2017, for "fail[ing] to follow firm policies and [the] code of ethics."[8] He became an investment adviser representative in late 2001, by passing the Series 65-Uniform Investment Adviser Law Examination.[9] There is no prerequisite to take the Series 65 exam to become an investment adviser representative.[10] A person can become an investment adviser without becoming a registered representative and associated person with a FINRA member. Mr. Stimpson chose to become both an investment adviser and registered

---

[4] *See* Hearing Transcript, Vol. I at 38:18-39:21, **Ex. 1.**
[5] *Id.* at 40:13-41:5.
[6] *Id.* at 88:22-89:18.
[7] *See* Brandon Stimpson, BrokerCheck, **Ex. 6**.
[8] *Id*.
[9] *Id.*
[10] *See* http://www.finra.org/industry/series65. *See* also Hearing Transcript, Vol. II at 225:23-226:18, **Ex. 2**.

financial representative and associated person with a FINRA member (subject to FINRA jurisdiction).

During the course of this meeting, Mr. Stimpson had Mr. Watson execute an "Account Application" for an account with Allegis Investment Services, LLC. The Account Application clearly specifies Allegis Investment *Services* (the FINRA member) in the first page header, the first page footer, underneath the "Signature of Registered Representative," and in multiple uses of the abbreviation AIS. *See* Account Documents, at 1, **Ex. 7**. Mr. Stimpson himself countersigned the Account Application in his capacity as Registered Representative. *Id.* at 2 He signed in the space marked "Signature of Registered Representative" and checked the box stating "Please check here if *Registered Representative* has seen and verified an original copy of the Customer Identification used on this account." *Id.* (emphasis added). He further identified himself with his Allegis Investment Services Registered Representative number ("AIS RR #"). *Id.* In the same meeting, Mr. Stimpson had Mr. Watson execute a "Discretionary Advisory Agreement" with Allegis Investment Advisors, LLC. Mr. Stimpson also had Mr. Watson execute a limited power of attorney authorization that would allow Mr. Stimpson and Allegis to place discretionary trades in Mr. Watson's TD Ameritrade account.

There is no dispute that during the course of that January 26, 2015, meeting, Mr. Stimpson recommended that Mr. Watson invest in the RUT Strategy.[11] To implement this strategy, Mr. Stimpson and Allegis directed trades in Mr. Watson's TD Ameritrade account. Mr. Watson testified that he had never invested in options prior to his relationship with Allegis.[12] This strategy exposed Mr. Watson to extraordinary potential losses with only a comparatively small potential for gain. Testimony at the hearing made clear that trades in the RUT Strategy could never earn

---

[11] Hearing Transcript, Vol. II, at 240:23-241:7, **Ex. 2**; Hearing Transcript, Vol. IV at 663:23-664:12 **Ex. 4**.
[12] Hearing Transcript, Vol. I, at 80:18-81:3, **Ex. 1**.

more than a small premium, while each trade could potentially expose the investor to a loss of the entire account value.[13]

Mr. Stimpson filled out portions of Mr. Watson's paperwork himself.[14] Mr. Watson testified that he was not given a chance to read the documents or provided an opportunity to review them, or given copies at the end of the meeting.[15] After Mr. Watson clearly indicated in his "Investor Profile" that his account ought to be in a "Balanced" portfolio, Mr. Stimpson added on the same page that Mr. Watson desired an investment strategy of "aggressive growth." *See* **Ex.** 7, at 12-13. Mr. Watson never stated that he desired an aggressive growth strategy.[16] Indeed, in his Investor Profile, Mr. Watson repeatedly indicated that he was not interested in high-risk investment products.[17] When asked to describe his "willingness to accept risk in order to achieve potentially higher returns," Mr. Watson specifically did *not* mark that he was "willing to accept a high level of risk in exchange for the potential for growth," which was among the options on the form. *See* **Ex. 7,** at 10. Instead, Mr. Watson stated that his aim was to make his money grow and that he knew that investing over the long term could help him reach his goals. Mr. Watson made clear that he would be "very uncomfortable" with a loss of only 20 percent. *Id.* Mr. Watson also made clear that anything greater than 18.75 percent drop in the value of his account in a given year would be inappropriate for his account. *Id.* at 11. The aggregate of all of this information made clear in Allegis' own paperwork and by Allegis' own formula that Mr. Watson's funds belonged in a "Balanced" portfolio, which Allegis defines as 60 percent "Equity," 38 percent "Bonds," 2 percent

---

[13] Hearing Transcript, Vol. IV, at 662:24-663:2, **Ex. 4**.
[14] Hearing Transcript, Vol. I, at 59:3-7, **Ex. 1**.
[15] Hearing Transcript, Vol. I, at 101:9-24, **Ex. 1**.
[16] Hearing Transcript, Vol. I, at 52:8-10, **Ex. 1**; Hearing Transcript, Vol. II, at 248:14-18, **Ex. 2**.
[17] Hearing Transcript, Vol. I, at 52:14-16, **Ex. 1**.

"Cash," *id.* at 12, and that the RUT Strategy was not a suitable investment recommendation, in contravention of FINRA Rule 2111.

Mr. Watson testified that Mr. Stimpson filled out the Mr. Watson's Account Application and that the account application misstated his income (not $200,000)[18], his investment time horizon (a few months, not 8-15 years)[19], and his number of dependents (5 not 4)[20]. states that Mr. Watson had an income a liquid net worth of $600,000 and a total net worth of $2 million. *Id.* at 2. Nearly all of Mr. Watson's liquid net worth was invested in his TD Ameritrade account. The Options Disclosure Acknowledgment makes clear that Mr. Watson's "participation in the Net Credit Spread option strategy [would] not exceed 25% of [his] investable assets." *Id.* at 9. Mr. Watson testified that he understood "investable assets" to mean his initial investment amount of approximately $514,000.[21] Pater Klaass, who served as Mr. Stimpson's supervisor at both AIS and AIA, testified that he understood "investable asset" to be the equivalent of Mr. Watson's liquid net worth, which was listed as $600,000.[22] Mr. Klaass testified that Mr. Stimpson had a duty to ensure that that Mr. Watson's account did not have more than 25% exposure in the RUT Strategy.[23] Mr. Klaass further confirmed that he reviewed the account application materials executed by Mr. Stimpson, and that he received notice of the initial deposit amount.[24] By permitting Mr. Watson's account to have more than 25% exposure to the RUT Strategy Mr. Stimpson and AIS violated FINRA Rule 2010 (unauthorized trading), and AIS failed in its duty to supervise Mr. Stimpson, pursuant to 3110 (failure to supervise).

---

[18] Hearing Transcript, Vol. I at 45:3-17, **Ex. 1**.
[19] *Id.* at 53:10-21.
[20] *Id.* at 51:16-19.
[21] *Id.* at 56:19-57:3.
[22] *Id.* at Hearing Transcript, Vol. III at 533:23-533:3.
[23] *Id.* at Hearing Transcript, Vol. III at 486:19-25.
[24] *Id.* at Hearing Transcript, Vol. III at 533:18-25.

As a result of Allegis' investment of Mr. Watson's retirement savings in the RUT Strategy, Mr. Watson lost nearly $300,000 of his retirement savings. The events resulting in this loss are described in an Agreement and Order entered at the conclusion of an investigations into Allegis' recommendation of the RUT Strategy by the Idaho Department of Finance, Securities Bureau. *See* Idaho Agreement and Order, **Ex. 8**:

> 13. On August 20, 2015, Allegis purchased 39,200 RUT contracts with an August 21, 2015 expiration and strike price of 1145. The cost of each contract was $0.4472. At the same time, Allegis wrote or sold 39,200 RUT contracts with an August 21, 2015 expiration and strike price of 1155. The premium or profit received on each contract was $0.5272— resulting in a net of approximately 37 basis points to each investor account.

> 14. As described above, Allegis sold a RUT put vertical spread, which means that the put they sold had a higher strike price (1155) than the put they purchased (1145). This trade would have been profitable if the RUT had expired above the short strike price of 1155 because the spread would have expired worthless—the short strike price would have been below the Russell settlement price and there would be no benefit in exercising the option.

> 15. Instead, the actual settlement price closed below 1155 at 1145.06. Because the option holder chose to exercise the options that Allegis sold, Allegis was required to buy 3,920,000 shares (39,200 option contracts with a multiplier of 100) of the Index at 1155 or approximately $4,527,600,000. To cover the cost of the purchase, Allegis was required to sell the 3,920,000 shares of the index at market price of $1,145.06 or approximately $4,488,635,200, resulting in investor losses.

Agreement and Order entered by the Idaho Department of Finance, Securities Bureau, further stated that "several RUT option investors were extremely unsophisticated investors, had limited investment experience and no prior option experience," and concluded that the RUT Strategy was unsuitable for numerous customers to whom it was marketed. *Id.*, ¶¶ 18, 20. A recent complaint by the Colorado Division of Securities similarly stated:

> From 2011 to 2015, the Defendants marketed and sold the strategy to Allegis clients in Colorado as a way to safely earn income on their clients' investments. But Defendants failed to disclose to their clients that while the strategy allowed the clients to collect a small premium or profit up front, most of the trades placed risked losing between 40-100% of the client's total account value, all with an average

potential upside of less than 1%. Unbeknownst to the clients, a small market move
could occasion catastrophic losses.

*See* Colorado Complaint, **Ex. 9**, ¶ 3.

## PROCEDURAL HISTORY

On December 13, 2016, Mark Watson, through counsel, filed a Statement of Claims. *See*
Statement of Claims. Dkt. No. 9-8, **Pl. Ex. H**. The Satement of Claims alleged that as a registered
representative and associated person of FINRA member AIS, Mr. Stimpson violated his
obligations under FINRA Rule 2111 by recommending unsuitable investments to Mr. Watson. *Id.*
at 8-11. The Statement of Claims further alleged that Mr. Stimpson violated his obligations under
FINRA Rule 2010 by directing that unauthorized trades be placed in Mr. Watson's account at TD
Ameritrade, *id.* at 11-13, and that AIS violated its duties under FINRA Rule 3110 to supervise its
associated person, Mr. Stimpson, in the exercise of these duties. *Id.* at 13-15. Finally, the Statmeent
of Claims alleged that both Mr. Stimpson and AIS owed a fiduciary duty to Mr. Watson and
breached that duty to Mr. Watson by permitting the purchase of securities in Mr. Watson's account
that were unauthorized and were unsuitable in light of Mr. Watson's Investor Profile.

Plaintiffs Answered the Statement of Claims on February 2, 2016. *See* Answer to Statement
of Claims, Dkt. 9-9, **Pl. Ex. I**. Plaintiffs later moved to dismiss the Statement of Claims on
January 8, 2018, pursuant to FINRA Rule 12504(a)(6)(B). *See* Respondents' Motion to Dismiss,
Dkt. 9-13, **Pl. Ex. M**. After oral argument on February 2, 2018, the FINRA Panel denied the
motion and ordered Plaintiffs to pay the forum fees for the argument. At the arbitration hearing,
on February 21, 2018, Plaintiffs renewed their motion to dismiss, pursuant to FINRA Rule
12504(b). This motion was similarly denied.

A five-day FINRA arbitration was conducted in Salt Lake City, Utah, on February 19,
2018, through February 23, 2018. Subsequently, the FINRA Panel entered an award on behalf of

Mr. Watson and against each respondent—Mr. Stimpson, AIS, and AIA—and finding each respondent "jointly and severally liable" to Mr. Watson for damages in the amounts set forth in the Award. *See* FINRA Arbitration Award at 2-3, Dkt. 9-16, **Pl. Ex. P.** The FINRA Panel further found that because AIA "answered the Statement of Claim, it is bound by the determination of the Panel on all issues submitted" and that "the business activities and identities of [AIA] and [AIS] were conflated with respect to [Mr. Watson] such that the Panel's determinations apply to [AIA] as well as [AIA]." *Id.* at 2. On April 5, 2018, Plaintiffs submitted this Motion to Vacate or Modify the Arbitration Award. *See* Dkt. No. 9. For the reasons set forth below, Defendant Mark Watson respectfully requests that the Motion be denied.

## STANDARD OF REVIEW

A district court may vacate an arbitration award only "for the reasons enumerated in the Federal Arbitration Act, 9 U.S.C. § 10, or for 'a handful of judicially created reasons.'" *Burlington N. & Santa Fe Ry. Co. v. Pub. Serv. Co. of Okla.*, 636 F.3d 562, 567 (10th Cir.2010) (quoting *Sheldon v. Vermonty*, 269 F.3d 1202, 1206 (10th Cir.2001)). These judicially created reasons "include violations of public policy, manifest disregard of the law, and denial of a fundamentally fair hearing." *Sheldon*, 269 F.3d at 1206.

In reviewing arbitration awards, courts in this circuit "give *extreme deference* to the determination of the arbitration panel for the standard of review of arbitral awards is among the narrowest known to law." *Id.* (emphasis added) (internal quotation marks and citation omitted). *Hollern v. Wachovia Sec., Inc.*, 458 F.3d 1169, 1172 (10th Cir.2006). This narrow standard "has been interpreted to mean that 'as long as the arbitrator is even arguably . . . acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.'" *Int'l Bhd. of Elec. Workers, Local Union No. 611, AFL–CIO v. Pub. Serv. Co. of N.M.*, 980 F.2d 616, 618 (10th Cir.1992) (quoting *United Paperworkers Int'l Union, AFL–CIO v.*

*Misco, Inc.*, 484 U.S. 29, 38 (1987)). Moreover, "[o]nce an arbitration award is entered, the finality of arbitration weighs heavily in its favor and cannot be upset except under exceptional circumstances." *Burlington*, 636 F.3d at 567 (internal quotation marks and citation omitted).

## ARGUMENT

I.    **The FINRA Arbitration Panel Properly Exercised its Jurisdiction because Mark Watson was a Customer of AIS, a FINRA Member, and Brandon Stimpson, an Associated Person of FINRA Member.**

FINRA Rule 12200 makes clear that a FINRA member "must arbitrate" before a FINRA panel where "[t]he dispute is between a customer and a member or associated person of a member" and "[t]he dispute arises in connection with the business activities of the member or the associated person." As a customer of AIS and Mr. Stimpson, FINRA has made clear that Mr. Watson's right to have his dispute with AIS and Brandon Stimpson adjudicated before a FINRA panel is unqualified and unwaivable.  Mark Watson was a customer of AIS and Mr. Stimpson because he (a) conducted business with AIS and Mr. Stimpson, (b) opened an account with AIS and Mr. Stimpson, and (c) AIS and Mr. Stimpson and AIS received compensation as a result of their securities recommendations to Mr. Watson. Each of these facts constitutes an independent basis for finding a customer relationship between Mr. Watson on the one hand, and AIS and Mr. Stimpson on the other.

A.    **A Customer of a FINRA Member has an Unqualified, Unwaivable Right to Arbitrate Disputes with FINRA Members before a FINRA Panel.**

Mark Watson had an unqualified, unwaivable right to arbitrate his dispute with AIS, a FINRA member, and Brandon Stimpson, (at the time) a FINRA registered representative and an associated person with a FINRA member firm. The FINRA panel did not exceed its authority in exercising jurisdiction over AIS or Mr. Stimpson. Mot. 9, 12.

Pursuant to Rule 12200 of the FINRA Code of Arbitration Procedure for Customer Disputes ("Customer Code"), FINRA customers have an unqualified, unwaivable right to arbitrate disputes with FINRA members before a FINRA arbitration panel. As FINRA's July 21, 2016 Regulatory Notice 16-25[25] makes clear: "[C]ustomers have a right to request arbitration at FINRA's arbitration forum any time and *do not forfeit that right under FINRA rules by signing any agreement with a forum selection provision* specifying another dispute resolution process or an arbitration venue other than the FINRA arbitration forum." Regulatory Notice 16-25 at 1. The Regulatory Notice also makes clear that "FINRA rules are *not mere contracts that member firms and associated persons can modify*," *id.* at 3, and that they "are *not default rules that may be overridden by more specific or separate contractual terms* without consequences under FINRA rules." *Id* at 5. (emphasis added). Consequently, "any member firm's denial, limitation or attempt to deny or limit a customer's right to request FINRA arbitration, even if the customer seeks to exercise that right after having agreed to a forum selection clause specifying a venue other than a FINRA arbitration forum, would violate [FINRA rules]." *Id.*

AIS as a FINRA member, and Mr. Stimpson as a FINRA registered representative and associated person of a FINRA member were required to comply with FINRA rules, including Rule 12200 requiring FINRA members and associated person to submit customer disputes to FINRA jurisdiction.

    **B.**    **Mark Watson was a Customer of AIS And Mr. Stimpson because He "Conducted Business" with AIS and Mr. Stimpson**

Mr. Watson was a customer of AIS and Mr. Stimpson (in his capacity as a registered representative and associated person of AIS) by virtue of his meeting and discussion with Mr. Stimpson, in which Mr. Stimpson recommended and facilitated Mr. Watson's investment in the

---

[25] *See* http://www.finra.org/sites/default/files/notice_other_file_ref/Regulatory-Notice-16-25.pdf.

RUT Strategy. This alone is a sufficient basis to confer jurisdiction on the FINRA Panel over this dispute.

While FINRA Rules do not define "customer," courts have repeatedly held that "persons who discuss investment possibilities with a registered representative of a [FINRA] member but do not open accounts with the [FINRA] member *are 'customers'* under [FINRA Rules]." *Vestax Securities Corp. Skillman*, 117 F. Supp. 2d 654, 657 (N.D. Ohio 2000) (emphasis added). *See also WMA Securities, Inc. v. Ruppert*, 80 F. Supp. 2d 786, 789 (S.D. Ohio 1999) ("The facts that Defendant . . . never had an account with Plaintiff and that the FLIC promissory notes in which both Defendants invested were not approved products of Plaintiff are irrelevant. *By conducting business with Plaintiff's registered representatives, Defendants conducted business with Plaintiff and became its customers*.") (emphasis added). *Lehman Brothers, Inc. v. Certified Reporting Co.*, 939 F. Supp. 1333, 1340 (N.D. Ill. 1996) (interpreting an analogous NYSE rule and holding that "[d]efining customers to include not only those who executed purchases with member firms, but also those who maintained a less formal business relationship at the time of the alleged misconduct, . . . recognizes market reality.").

There is no dispute that Mr. Watson met with Mr. Stimpson on January 26, 2015 or that at that meeting, Mr. Stimpson recommended Mr. Watson invest in the RUT Strategy. And there is no dispute that at that time, Mr. Stimpson was a registered representative and associated person of a FINRA member, AIS, and that AIS was responsible for supervising Mr. Stimpson to ensure that he complained with FINRA rules—including those rules that required that Mr. Stimpson make only suitable investment recommendations. Having conducted business with Mr. Stimpson and AIS, Mr. Watson had an unqualified, unwaivable right to submit his dispute to a FINRA arbitration panel.

### C.   Mark Watson was a Customer of AIS and Mr. Stimpson under FINRA Rule 12200 and the Second Circuit's *Abbar* Standard

Plaintiffs insist that Mr. Watson was not a customer of AIS or Mr. Stimpson under the test set forth in the Second Circuit Court of Appeals' decision in *Citigroup Glob. Markets Inc. v. Abbar*, 761 F.3d 268, 276 (2d Cir. 2014). The *Abbar* court defined "customer" for the purposes of Rule 12200 as "one who, while not a broker or dealer, *either* (1) purchases a good or service from a FINRA member, *or* (2) has an account with a FINRA member." *Citigroup Global Mkts. v. Abbar*, 761 F.3d 268, 275 (2d Cir. 2014) (emphasis added). These requirements are independent from one another. Thus, "an account holder has a reasonable expectation to be treated as a customer, *whether or not goods or services are purchased directly from the FINRA member.*" *Id.* (emphasis added).

The Tenth Circuit Court of Appeals has never adopted the *Abbar* standard, nor provided guidance construing the undefined term "customer" in FINRA Rule 12200. However, even if this court were to follow the *Abbar* standard, Mr. Watson would still be a "customer" of Mr. Stimpson and AIS because Mr. Watson opened an account with Mr. Stimpson and AIS and Mr. Stimpson and AIS received compensation as a result of Mr. Watson's securities purchases. Not surprisingly, The FINRA Panel heard Plaintiffs' arguments based on the *Abbar* at least four times during the course of this suit and rejected them each time.

### 1.   Mark Watson was a Customer of AIS and Mr. Stimpson because he Opened an Account with AIS

While a customer agreement with a FINRA member is not required to establish jurisdiction, under FINRA Rule 12200, it is undisputed that Claimant, in fact, executed an "Account Application," with Allegis Investment Services, LLC, on January 26, 2015. *See* Account Materials Application, **Ex. 7**. This is also, by itself, a sufficient to confer jurisdiction on the FINRA Panel over this dispute.

14

The Account Application *clearly* specifies Allegis Investment *Services* (the FINRA member) in the first page header, the first page footer, underneath the "Signature of Registered Representative," and in multiple uses of the abbreviation AIS. *Id.* at 1. Mr. Stimpson himself countersigned the Account Application in his capacity as Registered Representative. *Id.* at 2. He signed in the space marked "Signature of Registered Representative" and checked the box stating "Please check here if *Registered Representative* has seen and verified an original copy of the Customer Identification used on this account." *Id.* (emphasis added). He further identified himself with his Allegis Investment Services Registered Representative number ("AIS RR #"). *Id.* This Account Application was executed on the same day and in the same meeting in which Mr. Stimpson persuaded Mr. Watson to invest in the RUT Strategy, which investment resulted in a loss to Mr. Watson of approximately $300,000.

Faced with the incontrovertible fact that Mr. Watson had an account with AIS, Plaintiffs presented the FINRA Panel with the bizarre position that the "Account Application," executed by Mr. Watson and countersigned by Mr. Stimpson in his capacity as a registered financial representative and associated person of AIS did *not* establish any account with Allegis Services, but rather was used to gather information about Mr. Watson. *See* Dkt. 9-13, **Pl. Ex. M**, at 2. Nowhere does the Account Application state that it is for "informational purposes only" or that AIS is a "limited broker," or that contrary to what the document actually says, it does not in fact establish a customer relationship.[26] Requiring a customer to execute an account application that has no force or effect would not be an appropriate way to "gather information" about an investor. Indeed, such an approach would be highly deceptive. A customer executes and Account

---

[26] *See* Hearing Transcript, Vol. II at 245:25-247:12, **Ex. 2**.

Application in order to open an account with a FINRA member. This *post hoc* attempt to explain away the Account Application and Claimant's customer relationship with AIS cannot be credited.

### 2. Mark Watson was a Customer of AIS and Mr. Stimpson because he Purchased Goods and Services from Them

Mark Watson was a customer of AIS and Mr. Stimpson because he purchased goods and services from them. While serving as a registered representative and associated person of AIS, Mr. Stimpson recommended that Mr. Watson invest in the RUT Strategy. Mr. Stimpson thereafter received compensation of the result of Mr. Watson's investment in the RUT Strategy. This too is a sufficient basis to independently confer jurisdiction over this dispute upon the FINRA Panel.  Plaintiffs insist that Mr. Watson was not a customer of AIS (or Stimpson in his capacity as a registered representative and associated person of AIS[27]) because the transactions at issue (though directed by Mr. Stimpson) took place in Mr. Watson's TD Ameritrade Account. *See* Mot. at 2, 3, 8, 12. This is irrelevant.

Courts have repeatedly held that FINRA Rules "create[] the right of parties to compel [a FINRA]-member firm to arbitrate *even in the absence of a direct transactional relationship with the firm*." *Vestax Sec. Corp. v. McWood*, 280 F.3d 1078, 1081 (6th Cir. 2002).[28] Moreover, FINRA rules make clear that any indirect compensation from the purchase of a security is sufficient to confer jurisdiction. *See* FINRA Regulatory Notice 12-55 at Q & A 6(b) (Dec. 2012) (the term "customer" includes "a person who is not a broker or dealer who opens a brokerage account at a broker-dealer or purchases a security for which the broker-dealer receives or will receive, directly *or indirectly*, compensation.") (emphasis added).[29]

---

[27] Allegis claims that Mr. Stimpson only signed his submission agreement in his capacity as an investment advisor. Mot. at 3-4. No FINRA Rule permits Mr. Stimpson or Plaintiffs to make this distinction.
[28] *Vestax* considered National Association of Securities Dealers Rule 10301, the predecessor and "substantive[] equivalent" to FINRA Rule 12200. *See, e.g.*, *Waterford Inv. Servs., Inc. v. Bosco*, 682 F.3d 348, 353 (4th Cir. 2012).
[29] *See* http://www.finra.org/sites/default/files/NoticeDocument/p197435.pdf.

16

Mr. Stimpson recommended an investment strategy that was not suitable for Mr. Watson in violation of FINRA Rule 2111 on January 26, 2015.[30]  There is no dispute that at the time he made this recommendation, Mr. Stimpson was a registered representative and associated person with AIS and that Mr. Stimpson's compliance with FINRA rules was subject to AIS's supervision. There is similarly no dispute that when Mr. Watson ultimately invested in the RUT Strategy, Mr. Stimpson received compensation. Under FINRA Rules, this is sufficient to confer jurisdiction on the FINRA Panel over this dispute.

> **D.    Mark Watson was a Customer of AIS and Mr. Stimpson because Disputes about AIS's Failure to Supervise Mr. Stimpson Arise in Connection with its Business**

As the evidence presented at the arbitration hearing made clear, AIS violated its duties under FINRA Rule 3110 to supervise its associated person, Mr. Stimpson, which allowed Mr. Stimpson to violate FINRA rules. Disputes concerning the failure of a FINRA member to supervise its associated persons arise in connection with the FINRA member's business and are subject to the FINRA jurisdiction.

Courts have made clear that "[a] dispute that arises from a firm's lack of supervision over its brokers arises in connection with its business." *John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 58-59 (2d Cir. 2001) (internal citations and quotation marks omitted). Moreover, courts have held that when the investor deals with an agent or representative of the FINRA member, the investor deals with the FINRA member, and on that basis the investor is entitled to resolve disputes through FINRA arbitration. *See Oppenheimer & Co. Inc. v. Neidhardt*, 56 F.3d 352, 357 (2d Cir. 1995). Because AIS violated FINRA rules by failing to supervise Mr. Stimpson while he was

---

[30] *See* FINRA Rule 2111(a) ("A member or an associated person must have a reasonable basis to believe that a recommended transaction or *investment strategy* involving a security or securities is suitable for the customer . . . .") (emphasis added).

making unsuitable investment recommendations to Mr. Watson, and because Mr. Stimpson was an associated person and representative of a AIS, a FINRA member, the dispute in question arose out of the business of AIS and the exercise of jurisdiction by the FINRA Panel was appropriate.

\*　　　\*　　　\*

The FINRA Panel properly exercised its jurisdiction over about whether a FINRA member, AIS, and a registered representative and associated person with that FINRA member, Mr. Stimpson failed to comply with FINRA rules in their dealings with a customer. The submission of such disputes to FINRA arbitration is a binding and unwaivable obligation on FINRA members and associated persons by virtue of their affiliation with FINRA. This requirement ensures a low-cost and efficient dispute resolution avenue is made available to investors who are typically at a disadvantage in investor disputes. While focusing their attention on the FINRA Panels award against AIA, Plaintiffs' have failed to articulate any reasonable basis for this Court disregard FINRA's rules and upend the awards against AIS and Mr. Stimpson. Plaintiffs' motion to vacate the award as against AIS and Mr. Stimpson should therefore be denied.

## II. FINRA Properly Exercised Jurisdiction Over AIA

While the FINRA Panel had a separate, independent basis for exercising jurisdiction over AIS and Mr. Stimpson, the FINRA Panel also properly entered an award against AIA. The FINRA Panel found both that AIA "answered the Statement of Claim, it is bound by the determination of the Panel on all issues submitted"[31] and that "the business activities and identities of [AIA] and [AIS] were conflated with respect to [Mr. Watson] such that the Panel's determinations apply to [AIA] as well as [AIA]." *See* Dkt. 9-16, **Pl. Ex. P**, at 2.

---

[31] The February 16, 2017 Answer to the Statement of Claims identifies AIA, AIS, and Mr. Stimpson as Respondents, *see* Dkt. 9-11, **Pl. Ex. K**, at 2, and answers on behalf of "Respondents."

Plaintiffs insist that the notion of whether or not the business activities and identities of AIA and AIS were "conflated" was never submitted to the FINRA Panel and has no legal basis. Mot. at 11 n.13, 14-15. This is incorrect. In his pre-hearing brief and other filings, Mr. Watson argued that AIS and AIA should be barred by the doctrine of judicial estoppel from claiming AIS and AIA were separate entities for the purposes of the RUT Strategy. *See* **Ex. 10,** at 14 n.11. "The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting 18 Moore's Federal Practice § 134.30, p. 134-62 (3d ed. 2000).

Plaintiffs raised the assertion that AIA, and not AIS, offered and managed the RUT Strategy as part of their repeated attempt to avoid the jurisdiction of the FINRA Panel. But this assertion is in direct contradiction to representations AIS and AIA made in an insurance coverage claim filed in the United States District Court for the District of Utah. *See* 6.6.2017, *Allegis Investment Services, LLC, et al. v. Arthur J. Gallagher & Co. et al.,* 17-CV- 00515, Dkt. No. 7 (D. Utah) (the "Amended Complaint"). In the Amended Complaint, both Allegis Investment Services, LLC, and Allegis Investment Advisors, LLC, are "named insureds under the policy in question." *Id.* ¶ 5. In order to ensure recovery by both Allegis Investment Services, LLC and Allegis Investment Advisors, LLC, these parties define themselves "collectively" as "Allegis." The Amended Complaint thus states that it was "Allegis," *i.e.*, Allegis Investment Services, LLC *and* Allegis Investment Advisors, LLC that "employed a strategy of simultaneously purchasing and selling put options for the same security at different strike prices." *Id.* ¶ 30. It was "Allegis" that "engaged in trades utilizing its 'net credit spread' strategy." *Id.* ¶ 31. It was "Allegis" that sustained losses from its net credit spread strategy. *Id.* ¶ 31. And it was "Allegis" that began to "contest[]

these claims and affirmatively alleg[e] that it followed correct procedures for qualifying investors and disclosing risks." *Id.* ¶ 34.

In short, when seeking to recover from insurance policies in which both AIA and AIS are named as insureds, "Allegis" willingly conflates the two entities, but when seeking to avoid liability for the very same transactions, "Allegis" asks this Court (and asked the FINRA Panel) to make artificial distinctions that the law does not permit. It is further worth noting that each and every one of Plaintiffs witnesses at the hearing were at all times relevant to this dispute dually registered as registered representatives and associated persons with AIS, a FINRA member, and as investment adviser representatives with AIA. This included Mr. Stimpson; Mr. Stimpson's supervisor at both AIS and AIA, Mr. Klaass[32]; the chief compliance officer for both AIS and AIA, Ms. Staci Camagno[33]; and Mr. Heath Bowen, AIS's past, and AIA's current president.[34] Some 50 AIS and AIA employees are similarly registered.[35] Indeed, there was not anyone involved in Mr. Watson's account or his investment in the RUT Strategy that was not simultaneously registered with AIS and AIA.

In spite of all of this, even if this Court were to find that the FINRA Panel lacked jurisdiction to enter an award against AIA, the FINRA Panel had numerous separate bases for jurisdiction over AIS and Mr. Stimpson as set forth above.

## CONCLUSION

Defendant, Mark Watson, therefore respectfully requests that the Court deny the Motion.

---

[32] Hearing Transcript, Vol. II at 460:7-14, **Ex. 2.**
[33] *Id.* at 406:9-407:20.
[34] *Id.* at 374:8-14.
[35] *Id.* at 354:15-22.

DATED this 19th day of April, 2018.

PARR BROWN GEE & LOVELESS

/s/ Stephen C. Mouritsen
Jonathan O. Hafen
Chad Pehrson
Stephen C. Mouritsen
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
smouritsen@parrbrown.com

*Attorneys for Defendant*